

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 18, 2016**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| NETOCHE BRIGHAM FAIR, | § | CASE NO. 15-33400-SGJ-13 |
| | § | (Chapter 13) |
| DEBTOR. | § | |

### MEMORANDUM OPINION AND ORDER ON SHOW CAUSE MATTER INVOLVING DEBTOR'S PREVIOUS CHAPTER 13 BANKRUPTCY COUNSEL (ORDERING CERTAIN AMENDED DISCLOSURES AND DISGORGEMENT OF FEES)

This Memorandum Opinion and Order resolves a "Show Cause Matter" (herein so called) that arose in the above-referenced Chapter 13 case (the "Current Chapter 13 Case") of Netoche Brigham Fair (the "Debtor" or "Ms. Fair"). The matter was initiated with this court's "Order Setting Show Cause Hearing" (the "Show Cause Order"), entered on September 25, 2015 [DE # 26], which directed certain lawyers, who represented the Debtor in a ***prior*** Chapter 13 case, Case #13-33441 (the "Prior Chapter 13 Case"), to appear and show cause whether certain procedures they employed for the Debtor (and perhaps other debtor-clients they have represented in this court) were potentially inconsistent with the Bankruptcy Code, the Federal Rules of Bankruptcy

1

Procedures and other applicable authority, and may need to be remedied at least prospectively, if not retrospectively. The lawyers that were the subject of the Show Cause Matter will hereinafter be referred to as "Prior Bankruptcy Counsel" or "H&W Law Firm," and the two individual lawyers involved will be referred to as "Mr. H" and "Mr. W." [1] The procedures that this court ordered to be addressed in the Show Cause Matter were: (a) Prior Bankruptcy Counsel's having had **control over the Debtor's debit card** and (with the Debtor's authorization) utilizing it to make the Debtor's monthly Chapter 13 plan payments to the Chapter 13 Trustee for the Debtor (with Debtor's funds flowing from Debtor's bank account, then to a **non**-trust bank account maintained by Prior Bankruptcy Counsel, then to the Chapter 13 Trustee's account); and (b) Prior Bankruptcy Counsel recommending to this Debtor (and potentially other debtor-clients) a car dealership named New Start Auto, which sometimes qualifies debtors or soon-to-be debtors for new auto loans, **and New Start Auto then pays a portion of the debtors' attorney's fees** incurred for having counsel (i) file a new Chapter 7 case, (ii) convert a Chapter 13 case to Chapter 7, or (iii) file a motion to incur secured indebtedness on the debtor-client's behalf in an existing Chapter 13 case (**without any disclosure or court approval of the fee payments being made in any of these scenarios**).

This court has jurisdiction in this Show Cause Matter pursuant to 28 U.S.C. § 1334, and this is a core proceeding pursuant to 28 U.S.C. § 157(b). This court has authority to preside over this Show Cause Matter pursuant to the Northern District of Texas's Standing Order of

---

[1] As explained in the Show Cause Order, the court heard certain testimony from the Debtor about her Prior Bankruptcy Counsel in the context of hearings held on September 17 and 23, 2015, on the Debtor's motion to extend automatic stay, pursuant to section 362(c)(3) of the Bankruptcy Code. As is typical at a hearing on a section 362(c)(3) motion to extend stay, the Debtor testified about her Prior Chapter 13 Case and her reasons for needing to file the current case less than one year later. After the September 17 and 23, 2015 hearings, the court issued the Show Cause Order—directing Prior Bankruptcy Counsel to appear and address issues that were the subject of testimony on September 17 and 23, 2015.

Reference.  This Memorandum Opinion and Order constitutes the courts findings of fact and conclusions of law pursuant to Fed. Rules Bankr. Proc. 7052 and 9013.

## I.      FACTS

### A.      *First, the Simple Contested Matter that was Before the Bankruptcy Court on September 17 and 23, 2015:   Whether to Extend the Debtor's Automatic Stay in the Current Chapter 13 Case.*

1.      Ms. Fair filed the Current Chapter 13 Case on August 21, 2015.  As alluded to above, she filed a previous bankruptcy case (*i.e.*, the Prior Chapter 13 Case) on July 3, 2013, and it was dismissed approximately 19 months later, on February 3, 2015.  Thus, since only six-and-a-half months elapsed between the dismissal of the Prior Chapter 13 Case and the filing of the Current Chapter 13 Case, it was necessary for the Debtor to file a motion to have her automatic stay extended in the Current Chapter 13 Case, in order to have a stay against creditor actions beyond 30 days, pursuant to section 362(c)(3) of the Bankruptcy Code.

2.      A car lender, J&M Trust Sales ("J&M Car Lender"), objected to the Debtor's motion to extend stay.   At a hearing held on Debtor's motion on September 17, 2015 (and continued for a second day to September 23, 2015), the court heard testimony from the Debtor and a representative of J&M Car Lender.

3.      The testimony revealed that the Debtor bought a year 2012 Chevy Cruze (the "2012 Vehicle") from J&M Car Lender on February 3, 2015—just a few hours **before** the Prior Chapter 13 Case was voluntarily dismissed for failure to make plan payments (the PACER/CMECF docket sheet for the Prior Chapter 13 Case reflects that the Order of Dismissal was entered at 4:57 p.m. C.S.T. on February 3, 2015).  The Debtor made an $800 down payment that day, and then filed her Current Chapter 13 Case six-and-one-half months later.  The Debtor testified that she went car shopping on February 2, 2015—thinking that her Prior Chapter 13

Case had been dismissed in January 2015.[2] The Debtor made three payments on the 2012 Vehicle and then never made a payment again. The Debtor did not have any property insurance on the 2012 Vehicle. The Debtor was unable to get property insurance on the 2012 Vehicle because she did not have a valid driver's license due to an old, unpaid traffic ticket.[3] The Debtor was unemployed and her only income (except for perhaps family assistance) was government disability payments of $1,221 per month, and her monthly expenses were more than this amount. The Debtor put approximately 25,000 miles on the 2012 Vehicle in the approximately six-and-one-half months between buying it and filing the Current Chapter 13 Case.[4] Before buying the 2012 Vehicle, the Debtor had owned a previous car, a year 2011 Elantra (the "2011 Vehicle"), which she owned for approximately two years, until she took it to a mechanic's shop in November 2014 (during her Prior Chapter 13 Case) and the 2011 Vehicle thereafter went missing and was only recovered by her prior car lender after many months of searching for it.[5] The testimony further revealed that J&M Car Lender repossessed the Debtor's 2012 Vehicle prepetition (before the Current Chapter 13 Case was filed) because the Debtor had become three months delinquent on payments. Like the car lender on the 2011 Vehicle, J&M Car Lender had engaged in earnest efforts to find the 2012 Vehicle—finally finding it across from a Hooter's Restaurant after there had been three change-of-residences by the Debtor[6] and the GPS tracker

---

[2] *See* Transcript from September 23, 2015 hearing (the "9/23/15 Transcript"), pp. 16-19.

[3] *See* 9/23/15 Transcript, p. 20 (line 14)-p. 21 (line 15).

[4] *See* 9/23/15 Transcript, p. 56.

[5] *See* 9/23/15 Transcript, p. 39. The Debtor testified that her prior car lender, Skopos Financial, told her it could not find the 2011 Vehicle at the mechanic's shop at which she had left it, and Skopos Financial did not repossess the 2011 Vehicle until July 2015.

[6] *See* 9/23/15 Transcript, p. 27 (line 14)-p. 28 (line 19).

on the car had been disabled.[7] J&M Car Lender still had the 2012 Vehicle at the time of the filing of the Current Chapter 13 Case and was wanting permission to keep it (at least until the Debtor could obtain a new Driver's License and insurance) and, preferably, did not want the court to extend the Debtor's automatic stay.

4.    Ultimately, the court denied extension of the Debtor's automatic stay. But due to amazing and troubling testimony, the court found it necessary to issue the Show Cause Order directing her Prior Bankruptcy Counsel from her Prior Chapter 13 Case to appear and explain certain things to the court. As explained below, one troubling line of testimony dealt with advice that the Debtor allegedly received from Prior Bankruptcy Counsel that she should: (a) surrender her old vehicle (the 2011 Vehicle—the one that she testified had gone missing in a mechanic's shop) that she had been paying for under her plan in her Prior Chapter 13 Case for approximately a year-and-a-half, (b) convert her Prior Chapter 13 Case to a chapter 7 case where she could get discharged of her debts, and (c) get a newer car from a used car dealership called New Start Auto after the conversion, *and New Start Auto would take care of paying the Debtor's fees that would be owed to Prior Bankruptcy Counsel in connection with the conversion of her case to chapter 7*.[8] The testimony made it sound like this was a common strategy that Prior Bankruptcy Counsel employed with debtor-clients (*i.e.,* referring debtors to New Start Auto for a new car and then the dealership would pay legal fees associated with filing or converting a bankruptcy case). The second troubling line of testimony dealt with Prior Bankruptcy Counsel's control over the Debtor's debit card (discussed further at Part I.C. below).

---

[7] *Id.* at p. 58 (line 20)-p. 59 (line 19).

[8] *See* 9/23/15 Transcript, p. 15 (line 14)-p. 16 (line 8); p. 33 (line 7)-37 (line 2).

### B.   *New Start Auto:  Can this Possibly Be Ethical or Permissible?*

5.      Notably, when asked why her Prior Chapter 13 Case (which lasted for approximately 19 months), was ultimately dismissed for failure to make required plan payments, the Debtor described a situation in her last case of confusion and miscommunications with Prior Bankruptcy Counsel regarding a strategy the firm had recommended that worked something like this:  (a) the Debtor would surrender her 2011 Vehicle with the intention of converting her case to Chapter 7, (b) the Debtor would go see a car dealership with whom Prior Bankruptcy Counsel was familiar, that helped people with bad credit ("New Start Auto") and she would be able to purchase a new (*i.e.,* a used but newer) vehicle, and (c) New Start Auto would pay her legal fees that would have to be paid to Prior Bankruptcy Counsel in order to convert her case to Chapter 7.

6.      The Debtor stated that, "I was told by my attorney that . . . the only thing I was paying on, as far as my bankruptcy, was the car. . . . So they suggested that I do a forfeit of the car and go Chapter 7.  And in the mean—and they also had told me that they had a company [New Start Auto] I could get approved for with a car.  So I agreed to do that and forfeit the car. And so when I went to apply for the other car I couldn't get approved."[9]

7.      The Debtor elaborated that, by the time she had gone back and forth with New Start Auto and realized she could not qualify for a loan with them after all, that she had apparently missed two plan payments (*i.e.,* two months had gone by) and that caused the Prior Chapter 13 Case to be dismissed.[10]  In fact, the Debtor (at some point after realizing that she would not get a new car through New Start Auto), began shopping around and found a different car dealer not recommended by Prior Bankruptcy Counsel (*i.e.,* J&M Car Lender) to sell and

---

[9] *See* Transcript from September 17, 2015 hearing ("9/17/15 Transcript"), p. 3 (lines 12-23).

[10] *Id.* at p. 3 (lines 12-23).

6

finance a car (the 2012 Vehicle) and she purchased the 2012 Vehicle on February 3, 2015, just a few hours *before* her Prior Chapter 13 case was dismissed. Ms. Fair testified that this "was a misunderstanding" that she thought she was going to be in a Chapter 7 case, and that it was all okay—stating that "I was just totally misinformed from the whole ordeal."[11]  The Debtor stated she had been told by Prior Bankruptcy Counsel: "Go ahead and forfeit the other one [the 2011 Vehicle] and go Chapter 7. You'll have a, you know, a clean slate. So that's what I agreed to."[12]

8.       Ms. Fair went on to elaborate that her Prior Bankruptcy Counsel told her that "they've had several clients that they have sent to New Start Auto. They helped them get a car and with low interest and everything. And he's like, you've already paid—your bankruptcy as far as attorney fees and everything . . . So he's like you're paying all this money per month, and you paid your fees and court fines. So he said, why don't you forfeit that car, go Chapter 7. He said, we'll help you with Chapter 7, and we'll put you in touch with a car company."[13]  Ms. Fair went on to explain, "So when they gave me the New [Start] Auto person that—his name was Justin, he was calling back and forth . . ."[14]  "So when they said that they were going to get me over to Chapter 7 conversion, they stopped taking their payments" (*i.e.,* Prior Bankruptcy Counsel stopped making her chapter 13 plan payments for her through the use of her debit card—more to follow on this below).[15]  "And . . . so when I didn't get approved [through New

---

[11] *Id.* at p. 12 (lines 2-8).

[12] *Id.* at p. 12 (lines 12-17).

[13] *Id.* at p. 15 (lines 7-16).

[14] *Id.* at p. 15 (lines 17-19). To elaborate, Ms. Fair testified: "They [New Start Auto] called me. They did call me, but they told me that they were calling because they had gotten my name from [H&W Law Firm], and they would—they could help me get into a better auto with a lower interest rate. That's exactly how the conversation went. . . . [H]is name was Justin and he told me he had gotten my name from [H &W Law Firm]." *Id.* at 47 (lines 3-10).

[15] *Id.* at p. 15 (lines 24-25).

Start Auto], no one wanted to convert—pay the Chapter 7 conversion. . . . So I didn't know I was getting dismissed until it actually happened. I didn't even know I was late on payments because they always took them. So I just assumed that okay, they're not taking payments any more, I must be in Chapter 7."[16]

9. The court held a subsequent hearing on September 23, 2015. Ms. Fair testified again at this hearing. Among other things, she stated that, after her 2011 Vehicle went into the mechanic's shop during her Prior Chapter 13 Case, she was trying to determine how to get it out of the shop and "I had no intention of getting another car. And then . . . I was contacted by my attorney, [H&W Law Firm]. They said I had paid all my attorney fees; that I was really just making a trustee payment for just the car because all my other things had been paid off.[17] So that's why – how I got introduced to going to New Start Auto because I did have bad credit, plus, I'm in, you know, bankruptcy, that they could help me in a previous bankruptcy case, how it was presented to me."[18]

10. The Debtor elaborated at the September 23, 2015 hearing that New Start Auto initiated things with her. "They called me. They did call me, but they told me that they were calling because they had gotten my name from [H&W Law Firm], and that they would—they could help me get into a better auto with lower interest rate. That's exactly how the conversation went. . . . [T]hey just said they had—his name was Justin and he told me he had gotten my name from [H&W Law Firm], and that they could try to help me get a car and that was that."[19]

---

[16] *Id.* p. 16 (lines 3-9).

[17] The court notes that the only claims that "had been paid off" were attorney's fees, certainly not unsecured creditors.

[18] *See* 9/23/15 Transcript, p. 40 (lines 13-21).

[19] *Id.* at p. 47 (lines 4-11).

### C.   *The Debit Card Issue.*

11.     Ms. Fair testified that "When I first hired [H&W Law Firm], they gave me the

option that I could give them my debit card and they would just take the fees off every month

and get my trustee payment.  They would mail in my payment for me to make sure it was never

late."[20]   She confirmed that she did, indeed, give the firm her debit card and "I never had a

problem up until we got started with this New Start Auto thing."[21]  Subsequent to the Debtor's

testimony, Prior Bankruptcy Counsel (Mr. W) confirmed that it was a frequent practice of [H&W

Law Firm] (whenever they had a client who could not be on a wage directive order—such as

with a retired or self-employed person) for the firm to obtain authorization to use the client's

debit card to make an electronic payment to an account maintained by H&W Law Firm, then

obtain a cashier's check thereon, and send it to the Chapter 13 Trustee.  Mr. W testified that he

believed that they were helping debtors to succeed that way, but sometimes there would not be

money in a debtor's account, and H&W Law Firm could hopefully catch this immediately when

it happened and contact a debtor to get a plan payment in before it was too late and the case got

dismissed.  Mr. W testified that the firm obtained a signed debit authorization stating what day

the Debtor chose to make her Trustee payments and the firm would run the debit card on that

day.[22]  If a debit card did not clear on a particular day, then Prior Debtor Counsel would start

making phone calls to the client to address the delinquency.

12.     The court also heard testimony that Prior Bankruptcy Counsel put New Start Auto

in touch with the Debtor around the time that that Debtor was facing potential dismissal of her

---

[20] *Id.* at p. 43 (lines 7-11).

[21] *Id.* at p. 43 (lines 13-21).

[22] *Id.* at pp. 60-65.

Prior Chapter 13 Case.[23]  The evidence showed that credit checks were done by New Start Auto

on the Debtor during the late stages of her Prior Chapter 13 Case (January 22, 2015) as well as

back on March 4, 2014.[24]  Debtor credibly testified that New Start Auto contacted her by

phone—she never went to its place of business—and New Start Auto had gotten her phone

number from her attorney.[25]  The evidence showed that the Debtor was hoping to convert her

Prior Chapter 13 Case to a chapter 7 (not have it dismissed) and get a discharge and a newer car

with more favorable terms.  Although she ultimately did not convert her case[26] and did not

purchase a new car with New Start Auto, Mr. W confirmed that sometimes his firm would steer a

client to such dealership and ***such dealership might pay part of a client's conversion fees or

attorney's fees directly to Prior Bankruptcy Counsel***.[27]    The court expressed concern over this

practice—among other things, the court expressed concern about sections 504 and 526(a)(4) of

the Bankruptcy Code, as well as Section 329 of the Bankruptcy Code and Bankruptcy Rule 2016.

Prior Bankruptcy Counsel acknowledged that there may not have ever been any mention of any

payment of fees by New Start Auto on the various "Disclosures of Compensation" that Prior

Bankruptcy Counsel filed pursuant to Bankruptcy Rule 2016 in its cases in the past.  Mr. W

testified that he believes that having New Start Auto pay bankruptcy-related fees for a consumer

debtor is no worse than a family member paying such bankruptcy fees.

---

[23] *Id.* at p. 11.

[24] *See* Exh. K (9/23/15 Hearing).  *See also* 9/23/15 Transcript at p. 33 & p. 73 (line 19)-p. 74 (line 4).

[25] *Id.* at p. 35.

[26] To be clear, Debtor's Prior Chapter 13 Case was dismissed on February 3, 2015, approximately 19 months after it was filed.  Prior Bankruptcy Counsel received its full $3,000 fee for representing the Debtor during this case.

[27] *See* 9/23/15 Transcript at pp. 11-12 & p. 76.

13.    The court expressed strong concern about conflicts of interest.  The court, accordingly, issued the Show Cause Order directing Prior Bankruptcy Counsel to appear and show cause whether the practices described herein are consistent with the Bankruptcy Code, Rules and other applicable authority and, if not, how such matters should be remedied at least prospectively, if not retrospectively.  The court directed Prior Bankruptcy Counsel to be prepared to describe the exact procedures employed with regard to usage of debtors' debit cards for making Chapter 13 plan payments and also be prepared to disclose how many times and in what cases New Start Auto paid fees associated with a Prior Bankruptcy Counsel client bankruptcy case.

### D.    The Show Cause Hearing:  The Big Picture.

14.    At the Show Cause Hearing, the court once again heard testimony from Mr. W, a member of Prior Bankruptcy Counsel—only this time there was more detail.  Mr. W represented that, from January 1, 2012 through September 30, 2015 (which was the entire time that Prior Bankruptcy Counsel was operating as an entity—the firm had closed just days after the Show Cause Order was entered), the firm filed 840 chapter 13 cases and 609 chapter 7 cases, for a total of 1,449 consumer cases.[28]   Of that number, 108 cases (7%) were associated with New Start Auto in some way—meaning that the firm received some fees from New Start Auto.[29]   This was never disclosed in the bankruptcy cases in any way—for example not in a Bankruptcy Rule 2016 "Disclosure of Compensation" statement.[30]   There were 17 cases of the 108 cases in

---

[28] Transcript from November 9, 2015 Hearing ("11/9/15 Transcript") at p. 16.

[29] *Id.*

[30] *Id.* at 31.

which the client started out in a chapter 13 case and then there was a conversion to chapter 7, in which New Start Auto paid attorney's fees associated with conversion.

15.     There was an Exhibit 1 submitted by Prior Bankruptcy Counsel at the Show Cause Hearing, which was a multi-page chart they prepared listing *106* cases in which New Start Auto paid some amount of attorney's fees to Prior Bankruptcy Counsel (showing amounts received from New Start Auto, the dates of receipt of such funds, along with each debtor's name and case number, and a few other miscellaneous facts, such as the alleged reason for the new car purchase).  The court is not sure why the chart shows 106 debtor-clients when Mr. W represented there were 108 debtor-clients.  In any event, the chart is not easy to follow, in that it is not clear when particular payments were made in relation to a case filing, nor is it easily discernable when and whether the fees paid were associated with a car purchased during a chapter 13 case, versus right after conversion from chapter 13 to chapter 7, versus right after a simple chapter 7 was filed.  Interestingly, Mr. W emphasized in his presentation the relatively small percentage of firm clients (7%) that were associated with New Start Auto.  However, there is another number he did not mention.  Specifically, when one totals up the fees received from New Start Auto by Prior Bankruptcy Counsel as shown in Exhibit 1, it reflects that Prior Bankruptcy Counsel received *$77,175* from New Start Auto in the years 2014 and 2015 associated with these 106 debtor-clients.  The fees per client ranged anywhere from $250 to $1,000 per client.  And to be more specific, the 106 (or 108) cases were not spread over a 3½ year period but, rather, only a 1½ year period.

16.     Mr. W testified that the owner of New Start Auto (an individual named Justin Taylor) essentially "cold called" the firm at some point in time—coming to their law firm office

12

and introducing himself and his business.[31]    Mr. Taylor represented that New Start Auto believed they offer a better quality product to customers and that "if a debtor chooses to purchase a car with them, that they (*i.e.*, New Start Auto) pay a portion of the fees."[32]    Mr. W stated that his firm had no agreement (formal or informal) with New Start Auto in that regard.[33]

17.    Mr. W stressed that he does not steer clients to New Start Auto.  It just all depends on if clients need a car.  He thinks New Start Auto can help clients if they do and offers a good product.  Mr. W confirmed, however, that he has not investigated how New Start Auto's interest rates compared to their competitors nor how their car prices compare to value.[34]

18.    The court heard further testimony from Mr. H, the other principal of Prior Bankruptcy Counsel, at a later hearing on December 3, 2015, since Mr. H did not appear for the originally scheduled Show Cause Hearing.  Mr. H elaborated that there were "typically three scenarios played out" when a debtor might acquire a car and New Start Auto might pay some of the debtors' attorney's fees:  (a) a debtor filing a Chapter 7 case who wanted or needed a new car; (b) a debtor who was in a Chapter 13 case who wanted to convert to chapter 7 and get a new car; and (c) a debtor who filed and stayed in a Chapter 13 case and wanted or needed a new car, but needed to file a motion to incur debt in order to purchase a car during his case.[35]  New Start Auto would pay $400 to Prior Debtor's Counsel for chapter 13 motions to incur debt.[36]  New

---

[31] *Id.* at p. 22.

[32] *Id.* at p. 23.

[33] *Id.*

[34] *Id.* at p. 53.

[35] *See* Transcript from December 3, 2015 Hearing ("12/3/15 Transcript"), at p. 7 (lines 8-17).

[36] *Id.* at p. 7 (line 18)-p. 8 (line 2).

Start Auto would typically pay $525 to Prior Bankruptcy Counsel toward a debtor's attorney's fees associated with any conversion from chapter 13 to chapter 7.[37] In a simple chapter 7 filing scenario, New Start Auto would pay $700-$1,000 toward the debtor's attorney's fees associated with a chapter 7 case to Prior Bankruptcy Counsel.[38] Mr. H confirmed that there was never any formal agreement between New Start Auto and Prior Bankruptcy Counsel. He also confirmed that sometimes Prior Bankruptcy Counsel would give a client New Start Auto's name (*i.e.,* refer a client to New Start Auto) and sometimes *vice versa*.[39]

19.     In further describing the second scenario of a debtor converting from a chapter 13 case to a chapter 7 case, Mr. H stated that a debtor might go to New Start Auto and pre-qualify for financing for a car, then Prior Bankruptcy Counsel would "start the conversion process" and file a notice of conversion with the court.[40] No car would be disclosed on the conversion Bankruptcy Schedules because ***there would be no car actually purchased until after conversion***.

20.     Returning to the subject of the demonstrative aid (Exhibit 1) that Mr. W submitted at the earlier (November 9, 2015) Show Cause Hearing, it reflected that, between March 25, 2014 and September 20, 2015, there were 106 times that New Start Auto paid Prior Bankruptcy Counsel's fees on behalf of a debtor-client (aggregating more than $77,000 in total fees paid by New Start Auto to H&W Law Firm in a mere 18-month period). The Exhibit 1 was largely consistent with Mr. H's testimony. Of the 106 cases, as best this court can determine, 23 of them

---

[37] *Id.* at p. 8 (lines 4-23).

[38] *Id.* at p. 9 (lines 14-15).

[39] *Id.* at p. 22 (lines 4-12).

[40] *Id.* at p. 10 (lines 10-23).

involved cases that were converted from Chapter 13 to Chapter 7 and New Start Auto usually paid $525 to H&W Law Firm to cover attorney's fees associated with conversion, but apparently not always (sometimes more and sometimes less). It appears that in a few of these cases, H&W Law Firm was paid the entire amount of the "no-look" fee for chapter 13 representation of the debtor involved.[41] It appears that in several more of these converted cases, the cases were pending in chapter 13 for more than a year, so a substantial portion of the chapter 13 "no-look" fees would have been paid to H&W Law Firm.[42] In addition, it appears that seven of the 106 cases were simple chapter 13 cases in which H&W Law Firm received a $400 fee for filing a motion to incur debt (or simply requesting permission from the Chapter 13 Trustee to incur debt). *The vast majority of the 106 cases on the Exhibit 1 demonstrative aid appear to be cases that were filed as original chapter 7 cases (i.e., no chapter 13 cases) and the fees received by H&W Law Firm varied significantly but were often $750 or $1,000*. The court understands that in the original chapter 7 scenario, a debtor would visit New Start Auto, discuss purchasing a car with New Start Auto, then New Start Auto paid H&W Law Firm some amount of fees for filing a chapter 7 case for the debtor, then later the debtor would actually close on a purchase of a car from New Start Auto (thus, no car would be included within the chapter 7 bankruptcy case—in

---

[41] *See* Standing Order Concerning All Chapter 13 Cases, ¶ 10b&c (Bankr. N.D. Tex. June 13, 2014) (which allows Chapter 13 debtor's counsel to charge a flat fee of $3,500 for representing a debtor for the entire duration of a Chapter 13 case without the need for filing a fee application); *see also* Compensation and Expense Reimbursement to Debtor's Counsel in Chapter 13 Cases (Bankr. N.D. Tex. Jan. 7, 2013) (applicable to any chapter 13 case filed prior to June 13, 2014, but on or after January 1, 2013, which also allowed Chapter 13 debtor's counsel to charge a flat fee of $3500).

[42] To be clear, in this District, it is typical for a Chapter 13 debtor's counsel to get paid only a small portion of his "no-look" attorney's fees *pre*petition (*i.e.,* the $3,500 "flat fee" referenced above). The remainder of the "flat fee" is typically paid out over the first few months of the case, out of the regular monthly plan payments that the debtor makes to the Chapter 13 Trustee. The Standing Order Concerning All Chapter 13 Cases, ¶ 10b, makes clear that Chapter 13 Debtor's counsel must represent the Chapter 13 Debtor for the *entire* case (*i.e.,* for the full three or five years of the case—or however long it lasts), with very few exceptions. Thus, a Chapter 13 Debtor's counsel may feel like he is working for "free" the last half of a Chapter 13 case, when the "no look" fee has been fully paid.

fact, there might be an old car that would be scheduled as a "surrender," with the intention that, when the case was underway and Bankruptcy Schedules had been filed disclosing assets as of the Petition Date, then the debtor would subsequently get his new car at New Start Auto *post*petition).

21.    The court heard from the Assistant United States Trustee at the Show Cause Hearing that she has learned that there are at least six local law firms that have similar arrangements with New Start Auto as Mr. W described, and there is a larger investigation going on as to the propriety of these practices.[43]

22.    With regard to the debit card issue, Mr. W represented that some debtor-clients do not get regular pay checks and, for such clients, the firm believed it was helpful to give them the option of giving the firm authority to use the client's debit card to make plan payments during the case.[44] Prior Bankruptcy Counsel gave clients a "Chapter 13 Case Information" sheet (see Exhibit 3) at the beginning of representation that stated the amount of the client's plan payment, the due date for it, and then a box to check for "Method of Payment." The two choices for "Method of Payment" were:

> "Debit Authorization via [H&W Law Firm]" followed by the words "I authorize [H&W Law Firm] to run my debit card that is on file to cover my trustee payment. The payments will be ran [sic] as follows: [with a blank to fill in detail].
>
> "Mail Directly to Trustee" followed by the words "I understand that I must send the payment via money order and the money order must clearly state my case number and be addressed to the proper trustee. NO CHECKS."

23.    If the client checked the debit authorization box for method of payment, this was interpreted to give the firm authority to draw on the client's debit card to make regular Chapter

---

[43] 11/9/15 Transcript at p. 65-66.

[44] *Id.* at 41-43.

13 Trustee plan payments.[45] The firm used a system called "First Data" that was connected to its merchant services account.[46] The firm had an "isolated checking account that is set up, that is different from our operating account. It is solely—it is labeled trustee payment. And as the merchant services on—you know, if that client, their card is run on the 3rd, and it is deposited, the merchant services is deposited into that account at my bank account."[47] Mr. W elaborated that it was "not an IOLTA. In essence, it's just a checking account, but we reserve it only for trustee payments."[48] It was just a business checking account.[49] All clients who used this system had their funds commingled into this account.[50] The law firm would send a firm employee to the bank at which this account existed (Bank of America), and the employee would get cashier's checks and send them to the Chapter 13 Trustee's office for payment.[51]

24.     Mr. W and Mr. H both thought their debit card system worked well for many debtors. They did not have the numbers as to how many clients used this system over time.

25.     The court notes anecdotally that the form (Exhibit 3) did not explicitly state that debtors have the option of entering into an automatic withdrawal from the Chapter 13 Trustee on their checking account or arranging for a payroll deduction (*i.e.,* a wage directive) whenever they

---

[45] *Id.* at pp. 43-44.

[46] *Id.* at 44.

[47] *Id.* at 45.

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.*

are employed.[52]  Additionally, the Chapter 13 Trustee now has an "e-pay" option, although "e-pay" has not always been an option.

26.     In any event, Messrs. H and W indicated they are not employing the debit card system anymore.

27.     The court found all of the testimony of the witnesses to be generally credible with two exceptions.  First, the court does not believe that H&W Law Firm did not "steer" clients to New Start Auto.[53]  The totality of the evidence showed H&W Law Firm frequently steered clients to New Start Auto (and probably *vice versa*).  Second, the court does not believe the debit card practice described herein was purely aimed at increasing the success rate of debtors (by essentially, ensuring they properly, timely made chapter 13 plan payments).  Rather, the court believes that the Chapter 13 Trustee's office already has sufficient mechanisms to ensure this, and the practice was largely aimed at keeping debtors in their Chapter 13 cases long enough to pay Prior Bankruptcy Counsel's fees through plan payments.

## II.    CONCLUSIONS OF LAW

As stated above, this court's Show Cause Matter was initiated based upon the court's concerns regarding two practices employed by Prior Bankruptcy Counsel: (1) Prior Bankruptcy Counsel having had control over the Debtor's debit card and (with the Debtor's authorization) utilizing the debit card to make the Debtor's monthly Chapter 13 plan payments to the Chapter 13 trustee on behalf of the Debtor (with Debtor's funds flowing from Debtor's bank account, then to a non-trust bank account maintained by Prior Bankruptcy Counsel, then to the Chapter 13 Trustee's account); and (b) Prior Bankruptcy Counsel recommending to this Debtor (and

---

[52] *See* Exh. 3 (11/9/15 Hearing).

[53] *See generally* 11/9/15 Transcript, p. 53.

potentially other debtor-clients) New Start Auto, with New Start Auto often paying a portion of the Prior Bankruptcy Counsel's fees associated with filing a case, converting a Chapter 13 case to Chapter 7, or filing a motion to incur secured indebtedness on the debtor-client's behalf during chapter 13 cases (without any disclosure or court approval for this). The court now considers the different Bankruptcy Code Sections, Bankruptcy Rules, and ethical considerations these practices implicate and whether remedial measures are appropriate with regard to Prior Bankruptcy Counsel.

### A. *The Debit Card Practice.*

While Prior Bankruptcy Counsel's debit card practice was described as having good intentions behind it, the court is somewhat skeptical and believes that this practice likely had more to do with ensuring H&W Law Firm was getting paid its attorney's fees through the chapter 13 plan,[54] rather than helping debtors stay on track. However, no matter the true intention behind such practice, it is clear that this practice was ethically flawed.

The Texas Disciplinary Rules of Professional Conduct are applicable to the present situation, inasmuch as Prior Bankruptcy Counsel has made an appearance before the Northern District of Texas and is admitted to practice in its courts. The United States Court of Appeals for the Fifth Circuit has opined that the state disciplinary rules may be applied to attorneys appearing in the federal courts.[55] Rule 1.14 of the Texas Disciplinary Rules of Professional Conduct

---

[54] As noted earlier, in this District, it is typical for a Chapter 13 debtor's counsel to get paid only a small portion of his "no-look" attorney's fees *pre*petition. The remainder of the "flat fee" is typically paid out over the first few months of the case through the regular plan payments that the debtor makes to the Chapter 13 Trustee.

[55] *Resolution Trust Corp v. Bright*, 6 F.3d 336, 341 (5th Cir. 1993) ("[a] federal court may hold attorneys accountable to the state code of professional conduct"). *See also* L.B.R. 2090-2(b) & (d) ("A Presiding Judge, after giving opportunity to show cause to the contrary, may take any appropriate disciplinary action against a member of the bar for . . . unethical behavior; . . ." and defining the term "unethical behavior" as "conduct undertaken in or related to a case or proceeding in this court that violates the Texas Disciplinary Rules of Professional Conduct").

entitled "Safekeeping Property" is sometimes referred to as the trust account rule. It appears

applicable here and provides the following:

> (a) A lawyer shall hold funds and other property belonging in whole or in part to clients or third persons that are in a lawyer's possession in connection with a representation *separate* from the lawyer's own property. Such funds shall be kept in a ***separate account, designated as a "trust" or "escrow" account***, maintained in the state where the lawyer's office is situated, or elsewhere with the consent of the client or third person. Other client property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.[56]

Comment 1 to the Rule 1.14 further provides that:

> A lawyer should hold property of others with the care required of a professional fiduciary. Securities should be kept in a safe deposit box, except when some other form of safekeeping is warranted by special circumstances. All property which is the property of clients or third persons should be kept separate from the lawyer's business and personal property and, if monies, ***in one or more trust accounts. Separate trust accounts may be warranted when administering estate monies or acting in similar fiduciary capacities.*** Paragraph (a) requires that complete records of the funds and other property be maintained.[57]

The policy behind Rule 1.14 is, of course, to give the utmost protection to funds that belong to

the client, so that they are protected from a lawyer's creditors or personal financial problems.[58]

Acting as a fiduciary, lawyers are to treat client funds with the highest standards of

accountability.[59] The State Bar of Texas has made clear that funds of a client that are being held

for disbursement at a later time belong in a trust account.[60] The court notes that there are two

---

[56] Tex. Disciplinary Rules Prof'l Conduct R. § 1.14 (emphasis added).

[57] Tex. Disciplinary Rules Prof'l Conduct R. § 1.14, comment 1 (emphasis added).

[58] *See* A LAWYER'S GUIDE TO CLIENT TRUST ACCOUNTS, STATE BAR OF TEXAS, at 2 (Apr. 15, 2014).

[59] *Id.* at 3.

[60] *Id.*

types of trust accounts that lawyers may use for client funds: IOLTA[61] trust accounts and individual interest-bearing accounts. The term IOLTA account and trust account are not synonymous. An IOLTA account is a particular kind of trust account. The difference depends upon who is earning the interest on account funds. The general rule is that if client funds can reasonably earn interest, then they should be deposited into an individual interest-bearing trust account so that the client—not the lawyer—earns the interest on the client's own funds. Alternatively, if client funds cannot reasonably earn interest, the client funds should go into an IOLTA-type trust account, whereupon the interest earned on the funds shall be paid over to the Texas Access to Justice Foundation to benefit legal services for the indigent.[62] When monies of separate beneficiaries (*i.e.,* separate clients) are to be held only for a short period of time and are nominal in amount, the lawyer should use an IOLTA-type trust account.[63]

Here, the evidence presented in the Show Cause Matter demonstrated the following: (1) upon employing Prior Bankruptcy Counsel, debtor-clients were given "Chapter 13 Case Information" sheets and could select thereon an option that authorized Prior Bankruptcy Counsel to utilize the clients' debit cards to pay the debtors' Chapter 13 Trustee plan payments on dates specified by the debtor-clients; (2) client debit cards were, in fact, utilized by Prior Bankruptcy Counsel to transfer debtor funds into a separate business checking account maintained by Prior Bankruptcy Counsel at Bank of America (which Prior Bankruptcy Counsel testified was only used for clients' Chapter 13 plan payments, but was not designated in any way as a trust

---

[61] The "IOLTA" acronym refers to "interest on lawyers' trust account."

[62] *Id.* at 5-6. *See generally* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A, art. xi, § 5(B) & (C) (effective Jul. 1, 1989) (State Bar of Texas Rules).

[63] *See* A LAWYER'S GUIDE TO CLIENT TRUST ACCOUNTS, STATE BAR OF TEXAS, at 6 (n. 24-n. 26) (Apr. 15, 2014).

account); and (3) Prior Bankruptcy Counsel would send a firm employee to Bank of America to obtain cashier's checks drawn off of such checking account and would send such checks to the Chapter 13 Trustee's office for payment. In considering the requirements of Rule 1.14 (as well as the related comment and interpretive authority), the court notes—first and foremost—that the Bank of America account was not designated as a "trust" or "escrow" account. Lawyers' trust accounts should be entitled with such words as "Client Trust Account" (for individual interest-bearing accounts, using the client's tax identification number) or "IOLTA Account" (using the tax identification number for the Texas Access to Justice Foundation). There are special forms to complete for tax purposes.[64] Additionally, as mentioned, monies from different clients were being commingled in the account used for Chapter 13 plan payments. There was no particular evidence in the record as to whether thorough and detailed records were being kept by Prior Bankruptcy Counsel as to the deposits and withdrawals of various client funds into the account. Finally, an employee of the law firm (as opposed to an attorney) was withdrawing client funds from the checking account to obtain cashier's checks to send to the Chapter 13 Trustee's office. While a person under a lawyer's direct supervision may sign on a trust account (if this had been a trust account—which it was not), a lawyer will be liable for such person's actions and the State Bar of Texas recommends two signers on checks.[65]

Prior Bankruptcy Counsel's debit card practice clearly violated the parameters contemplated in Rule 1.14 of the Texas Disciplinary Rules of Professional Conduct. While funds may have been isolated from the H&W Law Firm's own funds, the account that was set up for clients' plan payments to the Chapter 13 Trustee was simply not "designated" as a separate

---

[64] *Id.* at 8.

[65] *Id.*

trust or escrow account.  Clearly, an IOLTA-type trust account was required here, since there were commingled client funds that were being held in nominal amounts for a short period of time.  Prior Bankruptcy Counsel's only evidence about all of this was their own testimony.  Their testimony did not reflect any details about the average balance in this account, or average deposits and disbursements from it over the period of time it was used, or how many clients actually used the debit card practice.  Mr. W's and Mr. H's testimony did not describe any particular safeguards in place to ensure protection of these funds separate and apart from the general assets of the firm or firm creditors.  Their testimony did not give any particular assurances that client funds were held with the highest standards of accountability—the testimony was mainly to the effect that H&W Law Firm thought it worked fine.  And, again, most importantly, no IOLTA trust account was used.  Courts in various contexts have addressed the paramount importance of keeping a client's funds separate and apart from both the lawyer's own funds and other clients.[66]  The reason for this authority is obvious: lawyers are fiduciaries and in a unique position of trust with their clients.  The potential for mistakes and abuse when these rules are not followed is enormous.

In spite of all this, the court was informed that neither Mr. H nor Mr. W is continuing to employ the debit card practice in their new separate law firms.  Moreover, the court has not learned of any accusations of misapplication of client funds (although Ms. Fair did express some general confusion regarding when and why the H&W Law Firm stopped using her debit card

---

[66] *See, e.g.*, *Archer v. State*, 548 S.W.2d 71, 73-75 (Tex. Civ. App.—El Paso 1977, writ ref'd n.r.e.)(disciplinary action against an attorney who deposited client funds in his own general business account and failed to pay at least some client bills); *Fry v. Comm'n for Lawyer Discipline*, 979 S.W.2d 331, 333-335 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (noting that rule 1.14 requires an attorney who receives funds, which belong in whole or in part to a client or third person, to deposit them into a trust account and promptly deliver the appropriate portion to the client or third person"); *Butler v. Comm'n for Lawyer Discipline*, 928 S.W.2d 659, 662-663 (Tex. App.—Corpus Christi 1996, no writ) (holding that an attorney violated Disciplinary Rule 1.14 by not maintaining workers' compensation settlement funds in a separate account until his client's other attorney was paid or the dispute resolved).

before her Prior Chapter 13 Case was dismissed). And while the court has no idea how much interest might have been earned on the account in question—and not paid over to the Texas Access to Justice Foundation as would have been required for an IOLTA account—the court assumes the interest earned was likely nominal, given today's low interest rates and the short time that client funds were apparently held in the H&W Law Firm account. Because Prior Bankruptcy Counsel no longer employs the debit card practice and there is no evidence of misapplication of funds, the court does not feel obliged to take any further action at this time. However, this ruling is without prejudice to any action that clients or the State of Texas might undertake regarding this matter. Moreover, the court would caution counsel to always consult the Texas Disciplinary Rules of Professional Conduct prior to embarking upon any practice which would involve handling a client's personal funds. The debit card practice in the situation at bar was improper and unwise. ***It should not be used by any counsel henceforth in cases before this court***.

### B. *The New Start Auto Issue.*

With regard to Prior Bankruptcy Counsel's receipt of attorney's fees directly from New Start Auto related to a debtor's or soon-to-be debtor's purchase of a vehicle from New Start Auto, the court raised concerns about possible violations of the following authority: (1) section 504 of the Bankruptcy Code; (2) section 329(a) of the Bankruptcy Code and Rule 2016; and (3) Section 526(a)(4) of the Bankruptcy Code.

### 1. **Section 504 of the Bankruptcy Code: Fee Sharing.**

Section 504 of the Bankruptcy Code governs the sharing of compensation among certain persons in a bankruptcy case. In general, section 504 of the Bankruptcy Code prohibits any person that is awarded compensation in the case under either subsections 503(b)(2) or 503(b)(4)

24

of the Bankruptcy Code from sharing such compensation with another person.[67]   The legislative history underlying this provision is somewhat limited; however, the language of section 504 of the Bankruptcy Code suggests a Congressional intent to protect the integrity of the bankruptcy process and ensure that professionals seeking compensation are motivated by a desire to preserve the bankruptcy estate more than fee maximization.[68]

Looking to the specific language of the statute, section 504 (a) of the Bankruptcy Code provides:

> (a)     Except as provided in subsection (b) of this section, a person receiving compensation or reimbursement under section 503(b)(2) or 503(b)(4) of this title may not share or agree to share—
> (1)     any such compensation or reimbursement with another person; or
> (2)     any compensation or reimbursement received by another person under such sections.

Thus, in order to trigger section 504 of the Bankruptcy Code, there appear to be three requirements: (1) a "person" must be receiving compensation or reimbursement; (2) the compensation or reimbursement received by such person must be pursuant to sections 503(b)(2) or (b)(4) of the Bankruptcy Code; and (3) the compensation or reimbursement received by such person must not be shared with another person.  As to the first requirement, "person" is defined in section 101 of the Bankruptcy Code to include an "individual, partnership, and corporation,"

---

[67] *Goldberg v. Vilt (In re Smith)*, 397 B.R. 810, 816 (Bankr. E.D. Tex. 2008).

[68] Adherence to this policy notion has resulted in many courts denying or ordering disgorgement of compensation upon a finding of improper fee-sharing; however, some courts will occasionally allow an attorney who would otherwise be prohibited by section 504 from sharing in compensation with another employed person to be employed retroactively so as to avoid application of the fee-sharing prohibitions of section 504(a) of the Bankruptcy Code.  *See e.g., U.S. Trustee v. Grenoble Apartments, II (In re Grenoble Apartments, II)*, 152 B.R. 608, 611 (D.S.D. 1993) (United States Trustee was not opposed to curing a section 504 violation through *nunc pro tunc* application); *In re Ferguson*, 445 B.R. 744, 757 (Bankr. N.D. Tex. 2011).  *But see In re ACandS, Inc.*, 297 B.R. 395, 403-404 (Bankr. D. Del. 2003) (*nunc pro tunc* approval of retention of professional not permitted*); Lemonedes v. Balaber-Strauss (In re Coin Phones, Inc.)*, 226 B.R. 131, 133–34 (S.D.N.Y. 1998) (court did not authorize *nunc pro tunc* retention when professional held self out as subcontractor for another firm).

so Prior Bankruptcy Counsel would easily be considered a "person" for purposes of section 101 of the Bankruptcy Code.[69]

As to the second requirement, section 503(b)(2) of the Bankruptcy Code, which is specifically referenced in section 504(a) of the Bankruptcy Code, [70] allows administrative expense status to any compensation and reimbursement awarded under section 330(a) of the Bankruptcy Code. Section 330(a), in turn, allows a court to award reasonable compensation for actual, necessary services rendered[71] by various types of professionals employed under sections 327 or 1103.[72] Thus, two questions now rear their heads. One—with regard to the fees being paid from New Start Auto—are we actually dealing with compensation awarded pursuant to section 330(a) here—for section 504(a) to even be applicable? In the case of chapter 13 debtor's counsel, the answer is yes. Section 330(a)(4)(B) of the Bankruptcy Code provides that "[i]n a chapter 12 or chapter 13 case in which the debtor is an individual, the court may allow reasonable compensation to the debtor's attorney for representing the interests of the debtor in connection with the bankruptcy case based on a consideration of the benefit and necessity of such services to the debtor and the other factors set forth in this section."[73] Thus, section 504

---

[69] 11 U.S.C. § 101(41).

[70] Section 504 also references section 503(b)(4) of the Bankruptcy Code. Section 503(b)(4), in turn, refers to "reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph 3 . . .". These referenced provisions, in turn, address compensation and reimbursement incurred by certain *creditors* of the estate; thus, the court does not believe them applicable to the facts of this proceeding and, therefore, section 503(b)(4) will not be addressed in the court's discussion of section 504 of the Bankruptcy Code.

[71] The statute also allows for reimbursement of actual, necessary expenses incurred by the professionals identified.

[72] The professionals employed might also include those appointed under sections 332, 333, and 1104—none of which are relevant here.

[73] As noted earlier, in this District, chapter 13 Debtor's counsel's fees are governed by Standing Order Concerning All Chapter 13 Cases, ¶ 10 (Bankr. N.D. Tex. June 13, 2014).

clearly applies in chapter 13 cases; specifically, it would apply whenever Prior Bankruptcy Counsel was paid fees associated with the filing of a motion to incur debt in a chapter 13 case. However, chapter 7 attorneys are typically not paid pursuant to awards made under section 330 of the Bankruptcy Code.[74]  Does this mean that section 504 does not generally apply in chapter 7 cases?  The answer is not crystal clear.  At least one court has used section 503(b)(2)'s reference to section 330(a) of the Bankruptcy Code (which, in turn, states that it is subject to section 329 of the Code),[75] to allow for a review of fee-sharing arrangements involving chapter 7 debtor's counsel, specifically where such arrangements were made pre-petition.[76]  However, other courts have held that section 504's prohibition against fee sharing applies only with respect to fees paid from the ***estate*** under sections 503(b)(2) and (b)(4) of the Bankruptcy Code and that section 504 of the Bankruptcy Code is, therefore, not applicable to fees paid to a chapter 7 debtor's attorney.[77]  Thus, these courts would hold that the fees received by Prior Bankruptcy Counsel from New Start Auto in the other two scenarios outlined above (attorney's fees associated with the conversion of a bankruptcy case from chapter 13 to chapter 7 and attorney's fees received for the filing of a new chapter 7 bankruptcy case) would not be subject to section 504 of the Bankruptcy Code.

---

[74] *See, e.g., Lamie v. U.S. Trustee*, 540 U.S. 526, 534-38 (2004) (section 330(a) does not authorize compensation to debtor's attorneys from the estate unless they are employed in a chapter 7 by a trustee under section 327 with court approval).

[75] Section 330(a) specifically starts out as follows:  "After notice to the parties in interest and the United States Trustee and a hearing, ***and subject to sections 326, 328, and 329***, the court may award . . . reasonable compensation [to various types of professionals]" (emphasis added).

[76] *See In re Soulisak*, 227 B.R. 77, 82–83 (Bankr. E.D. Va. 1998); *see also In re Matis*, 73 B.R. 228, 231 (Bankr. N.D.N.Y. 1987).

[77] *See, e.g., In re Johnson*, 411 B.R. 296, 299 (Bankr. E.D. La. 2008) & *In re Harwell*, 439 B.R. 455, 460, fn. 2 (Bankr. W.D. Mich. 2010).  It is important to note that, while these courts held that section 504 of the Bankruptcy Code was not applicable in chapter 7 cases, they did ultimately find that Bankruptcy Rule 2016 continues the requirement that debtors' counsel disclose fee sharing arrangements, even in Chapter 7 cases.  *Id.*  The court will examine the implications of Bankruptcy Rule 2016 below.

However, whether or not section 504 of the Bankruptcy Code is generally applicable to fees awarded to debtor's counsel in chapter 7 cases ultimately does not matter, because this court finds that the third requirement of section 504 did not occur with regard to New Start Auto and Prior Bankruptcy Counsel in any of the scenarios that have been presented to the court.  Recall that the third requirement of section 504 is that compensation or reimbursement awarded pursuant to sections 503(b)(2) and 330 must not be shared with another person.  Specifically, in all of the three scenarios described above, Prior Bankruptcy Counsel did not share any of *its* compensation with New Start Auto.  By way of example, if a debtor had given Prior Bankruptcy Counsel $500, and then Prior Bankruptcy Counsel had given some portion of that to New Start Auto, then arguably the third requirement of section 504 would be met here (although section 504 is more typically triggered when a lawyer secretly associates other *counsel* to assist in his cases and shares fees outside the firm for that reason).   By way of further example, if a debtor had paid New Start Auto $500 (say as a down payment on a car), which New Start Auto then gave to Prior Bankruptcy Counsel to pay for lawyer fees, and then Prior Bankruptcy Counsel ultimately gave a portion of that $500 back to New Start Auto, then there may arguably have been an actual "sharing" of fees.  This is not what ultimately occurred here.  Essentially, it appears from the facts that there was simply a third party (New Start Auto) paying some portion of debtors' attorney's fees on the debtors' behalves (again and again and again—at least some 106 times to H&W Law Firm), without it ever being disclosed.  Maybe this was essentially an undocumented referral fee arrangement—the evidence is not at all clear.  H&W Law Firm and New Start Auto had only an oral arrangement—perhaps for good reason.  In any event, the court cannot find that there has been any prohibited "fee sharing" which would trigger section 504 of

the Bankruptcy Code. However, section 329 and Bankruptcy Rule 2016 are an altogether different story.

### 2. Section 329 of the Bankruptcy Code and Bankruptcy Rule 2016: Fulsome Disclosure is Required.

Section 329(a) of the Bankruptcy Code and Bankruptcy Rule 2016 require complete and fulsome disclosure to the bankruptcy court and parties in interest of the amounts paid to a debtor's attorney, ***including the source of such amounts***. These provisions apply to every attorney employed by every debtor in every chapter, regardless of the purpose for which the attorney is retained, and notwithstanding the fact that an attorney will not be seeking formal employment by, nor compensation from, the bankruptcy estate. Starting with the literal wording of section 329 of the Bankruptcy Code, it states that "[a]ny attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation."[78] The purpose behind these provisions is both to prevent overreaching by a debtor's attorney and provide protection to creditors.[79]

Implementing this requirement, Federal Rule of Bankruptcy Procedure 2016(b), entitled "Disclosure of Compensation Paid or Promised to Attorney for Debtor," contemplates that

---

[78] 11 U.S.C. §329(a).

[79] *In re Ray*, 314 B.R. 643, 652-53 (Bankr. M.D. Tenn. 2004) (citing *In re Hunt*, 59 B.R. 842, 844 (Bankr. N.D. Ohio 1986)) & *In re Mayeauz*, 269 B.R. 614, 621 (Bankr. E.D. Tex. 2001) (citing *Jensen v. U.S. Trustee (In re Smitty's Truck Stop, Inc.)*, 210 B.R. 844, 848 (10th Cir. BAP 1997)).

"[e]very attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 14 days after the order for relief, or at another time as the court may direct, the statement required by section 329 of the Code."[80]  Moreover, "A supplemental statement shall be filed and transmitted to the United States trustee within 14 days after any payment or agreement not previously disclosed."[81]  What does this statement look like? The Disclosure of Compensation, Official Form, "Form B203", which was in effect until December 1, 2015,[82] provides the following:

### DISCLOSURE OF COMPENSATION OF ATTORNEY FOR DEBTOR

1.  Pursuant to 11 U.S.C. § 329(a) and Fed. Bankr. P. 2016(b), I certify that I am the attorney for the above-named debtor(s) and that compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:

    For legal services, I have agreed to accept . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $_____

    Prior to the filing of this statement I have received . . . . . . . . . . . . . . . . . . . . . . . . . . . $_____

    Balance Due . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $_____

2.  The source of the compensation paid to me was:

    ☐ Debtor          ☐ Other (specify)

3.  The source of compensation to be paid to me is:

    ☐ Debtor          ☐ Other (specify)

4.  ☐ I have not agreed to share the above-disclosed compensation with any other person unless they are members and associates of my law firm.

    ☐ I have agreed to share the above-disclosed compensation with a other person or persons who are not members or associates of my law firm.  A copy of the agreement, together with a list of the names of the people sharing in the compensation, is attached.

---

[80] Fed. R. Bankr. P. 2016(b).

[81] *Id.*

[82] The new form entitled "Disclosure of Compensation of Attorney for Debtor," Form Number B 2030, is largely identical to Form Number B203 and became effective on December 1, 2015.

30

The court would note that questions 2 and 3 on this form require counsel for the debtor to disclose the source of both pre- and postpetition payments. The bottom of Form B203 also contains the following certification language: "I certify that the foregoing is a complete statement of any agreement or arrangement for payment to me for representation of the debtor(s) in this bankruptcy proceeding."

Here, it is undisputed that Prior Bankruptcy Counsel *never* disclosed that portions of the fees it received as part of its compensation for representing at least 106 debtors were from New Start Auto. Rather, to the extent a fee received from New Start Auto was disclosed, Prior Bankruptcy Counsel only disclosed that the source of the compensation received was "the Debtor," which was clearly not accurate. This is beyond troubling. The honest and comprehensive disclosure of compensation payments plays a vital role in maintaining the integrity of the bankruptcy system.[83] Moreover, it is only upon full and complete disclosure of compensation payments under section 329(a) of the Bankruptcy Code and Rule 2016 that this court is able to review and determine whether such payments were excessive under section 329(b) of the Bankruptcy Code and Rule 2017.[84] When an attorney unilaterally elects to conceal the existence of payments that might otherwise be subject to examination by creditors and the court, the entire compensation review process is derailed and public confidence in the system is damaged.[85] The failure to disclose is a breach of the duty of candor to the tribunal.[86] It implicates Bankruptcy Rule 9011. Because of the importance of this process, a bankruptcy court

---

[83] *Mayeux*, 269 B.R. at 628.

[84] *Id.* at 621.

[85] *Id.* at 621-22.

[86] *See* Tex. Disciplinary Rules Prof'l Conduct R. 3.03.

retains the power, authority, and duty to police the disclosure and reporting requirements set forth in the Bankruptcy Code and Rules with its sanctioning powers, including the power to order the disgorgement of all sums received by counsel and the forfeiture of all compensation paid to counsel in a particular case.[87]

Here, as earlier stated, Prior Bankruptcy Counsel failed to disclose in 106 different bankruptcy cases, between 2014 and 2015, that the source of some of its attorney's fees was New Start Auto, which was a clear failure to comply with section 329(a) of the Bankruptcy Code and Rule 2016(b). It was also a clear failure to comply with Rule 3.03 of the Texas Disciplinary Rules of Professional Conduct (and perhaps other authority). This court feels compelled to take remedial measures.[88] Accordingly, as a result, the court is ordering that Prior Bankruptcy Counsel file amended Rule 2016 Statements in all the bankruptcy cases where it received a portion of its attorney's fees from New Start Auto. As many of these cases were filed between

---

[87] *Id.* at 628 (citing *Anderson v. Anderson (In re Anderson)*, 936 F.2d 199, 204 (5th Cir.1991)); *see also Arens v. Boughton (In re Prudhomme)*, 43 F.3d 1000, 1003-05 (5th Cir.1995) (the court's broad discretion in awarding and denying fees paid in connection with bankruptcy proceedings empowers the bankruptcy court to order disgorgement as a sanction to debtors' counsel for nondisclosure); *In re Whaley*, 282 B.R. 38, 41 (Bankr. M.D. Fla. 2002) (attorneys who fail to disclose compensation should suffer strict and quick consequences that could include the imposition of sanctions or the disgorgement of all fees paid in the case); *Wootton v. Ravkind (In re Dixon)*, 143 B.R. 671, 680 (Bankr. N.D. Tex. 1992) (failure to file a Rule 2016(b) statement of compensation in compliance with § 329 constitutes independent grounds for ordering disgorgement of counsel's fees).

[88] This court has pondered carefully whether Prior Bankruptcy Counsel received appropriate notice and due process of potential disciplinary measures by this court. To be clear, this matter all started with testimony in the context of a motion to extend stay in the above-referenced bankruptcy case, where the Debtor has new counsel. The court issued its Show Cause Order on September 25, 2015, notifying H&W Law Firm that it had concerns about its Debit Card Practice and its taking payments from New Start Auto and whether these practices were improper and "should be remedied at least prospectively, if not retrospectively." The court set the Show Cause Order for hearing on November 9, 2015 (giving H&W Law Firm 45 days notice of the hearing). The court issued a second order on November 16, 2015, directing Mr. H to appear on December 3, 2015 for a continued hearing on the Show Cause Matter when he failed to appear on November 9, 2015. The court also directed post-hearing briefing to be submitted, first ordering it to be filed by December 31, 2015, and then granting an extension to February 1, 2016. On balance, the court believes it has given appropriate and fair notice to Mr. H and Mr. W of the court's concerns and the possibility that the court might hold them accountable for infractions of the Bankruptcy Rules, the state code of professional conduct, and potential other authority. *See, e.g.*, L.B.R. 2090-2(b) & (d) ("A Presiding Judge, after giving opportunity to show cause to the contrary, may take any appropriate disciplinary action against a member of the bar for . . . unethical behavior; . . ." and defining the term "unethical behavior" as "conduct undertaken in or related to a case or proceeding in this court that violates the Texas Disciplinary Rules of Professional Conduct.").

2014 and 2015, Prior Bankruptcy Counsel will also be responsible for paying any fees associated

with reopening any previously closed cases so that an amended Rule 2016 statement can be

filed.[89]  In addition to requiring that amended Rule 2016 statements be filed in all the bankruptcy

cases where attorney's fees were received from New Start Auto, Prior Bankruptcy Counsel shall

***disgorge all funds*** that it has received from New Start Auto.  According to the Exhibit 1

presented by Mr. W, this would ***total $77,175***.  The court believes that the disgorgement of these

fees is commensurate with the egregiousness of the nondisclosure.[90]  However, rather than

requiring the money to be repaid to New Start Auto (which the court finds unpalatable—since it

was essentially complicit in the impropriety here), the court orders the disgorged funds to be paid

into the Registry of the Bankruptcy Court—where the funds will be held pending any fee

application requests of the Chapter 13 Trustee or United States Trustee—to reimburse them for

their time and expense in having to address the matters raised herein.  In the event the Chapter 13

Trustee and United States Trustee do not apply for reimbursement of fees and expenses, or any

amounts awarded to them do not reach $77,175, the remaining amount of disgorged fees will be

---

[89] According to Exhibit 1, which was discussed at the Show Cause Hearing, Prior Bankruptcy Counsel filed 106 cases in which New Start Auto provided payment of attorney's fees.  Mr. W was the attorney of record in 46 of those cases (the "Mr. W NSA Cases") and has represented that he is responsible for those cases.  Mr. W has stated in his post-hearing brief that he amended the Rule 2016 statements with respect to the Mr. W NSA Cases.  *See* DE # 69, p. 3 fn. 3.  He has alleged that he has no authority to file pleadings on behalf of Mr. H and respectfully submits that Mr. H is responsible for the cases for which he has signed pleadings.  *Id.* The court is therefore ordering Mr. H to file amended Rule 2016 statements in the cases where he is attorney of record.  However, the court would note that any fees associated with opening a previously closed case are the joint and several liability of Prior Bankruptcy Counsel, not just Mr. H or Mr. W.

Additionally, the United States Trustee stated in its post-hearing brief that there were 17 additional bankruptcy cases (which were not listed on Exhibit 1) in which Prior Bankruptcy Counsel received a fee from New Start Auto.  *See* DE # 68, p. 3.  Prior Bankruptcy Counsel should investigate this claim further and ensure that it has accounted for all the cases where it received a fee from New Start Auto.

[90] *Whaley*, 282 B.R. at 41-42.

donated by order of this court to the Texas Access to Justice Foundation, which provides legal aid to indigent Texans.

Again, this court cannot emphasize the importance of disclosing not only the amount of attorney's fees received, but also the *source* of such fees. Disclosure is what enables a bankruptcy court and parties to examine and identify potential issues with fee agreements before, or soon after, such agreements are actually consummated. Upon reviewing disclosures, the bankruptcy court may, where appropriate, order the return of compensation that exceeds the reasonable value of such services. Moreover, in reviewing fee arrangements, a bankruptcy court can ascertain potential conflicts of interest (either under the Bankruptcy Code—where applicable—or as set forth in the Texas Disciplinary Rules of Professional Conduct) and address any issues as necessary.[91] Thus, disclosure enables a court to review not only whether the fee arrangement itself is *reasonable in terms of value*, but also whether the services provided by debtor's counsel were *"untainted" by third-party influences*.

This court has found scarcely any authority dealing with a fact pattern such as the case at bar. The closest case that the parties or court could find is a case reported by the bankruptcy court for the Middle District of Tennessee styled *In re Ray,* which confronted a fee reimbursement arrangement related to the *redemption* of vehicles in a chapter 7 context (as opposed to the *purchasing* of vehicles). The court believes that a discussion of the *In re Ray* case may be helpful in demonstrating the importance of the distinct, yet intertwined principles of *reasonableness* and *conflicts of interest*, that underlie the duty to disclose compensation arrangements in bankruptcy. This court initially had some question as to whether conflicts of interest of debtor's counsel may, or must, be governed by the Bankruptcy Code, when such

---

[91] *In re Ray*, 314 B.R. 643, 653 (Bankr. M.D. Tenn. 2004).

debtor's counsel is not employed pursuant to section 327 of the Bankruptcy Code (which is the section dealing with "disinterestedness" and "adverse interests"). To be clear, Chapter 7 and Chapter 13 debtor's counsel are not employed pursuant to section 327 of the Bankruptcy Code. Perhaps it could be argued that the disclosure requirements of section 329 (and Bankruptcy Rule 2016)—which *do* apply in Chapters 7 and 13—are merely about policing *reasonableness* of the amount of compensation paid in the chapter 7 and 13 context, and the *source* (and *conflicts of interest*) only matter in the *Chapter 11 context*. This court has concluded that conflicts of interest *do* matter and should be policed to some extent in Chapter 7 and 13.

### a) *The In re Ray Case.*

In *In re Ray*, the United States Trustee brought a "motion to disgorge attorney fees under section 329 of the Bankruptcy Code" in three different chapter 7 cases against debtor's counsel ("Chapter 7 Counsel").[92] In all three of these cases, the debtors had redeemed a vehicle pursuant to section 722 of the Bankruptcy Code[93] and had borrowed funds to redeem their vehicles from an entity called 722 Redemption Funding, Inc. ("Redemption Funding"). The debtors' loans with Redemption Funding included a provision that allowed the debtors to borrow enough funds to pay their Chapter 7 Counsel's attorney's fees associated with the redemption. At the closing of each of the loans, Redemption Funding disbursed the loan proceeds that paid off the redemption value to the secured creditor, paid the fees associated with the loan, and paid Chapter 7 Counsel his attorney's fees. Chapter 7 Counsel first learned about Redemption Funding at a seminar booth and through mailings brought in by his clients. Chapter 7 Counsel estimated that

---

[92] *Id.* at 646.

[93] Section 722 of the Bankruptcy Code entitled "Redemption" provides that "An individual debtor may . . . redeem tangible personal property intended primarily for personal, family, or household use, from a lien securing a dischargeable consumer debt . . . by paying the holder of such lien the amount of the allowed secured claim of such holder that is secured by such lien in full at the time of redemption." 11 U.S.C. § 722.

Redemption Funding had been used by his clients in approximately 10 to 20 redemptions.

Redemption Funding paid Chapter 7 Counsel's standard fee of $300 via a paper check following

closing of the loans. The interest rate on the three loans at issue with Redemption Funding was

24% and Chapter 7 Counsel had never attempted to negotiate a different rate. Further, Chapter 7

Counsel did not recall discussions about payment of the $300 directly from the debtors rather

than borrowing the funds. Chapter 7 Counsel's recollection was that the debtor's preferred to

borrow the funds because they were typically low on cash. As to what normally occurred in a

vehicle redemption motion, Chapter 7 Counsel testified that, although many are routine,

complicating factors can occur such as: (1) explanation of redemption procedure; (2) if

Redemption Funding was used, determination of whether the loan was approved; (3) arranging

of an appraisal; (4) preparation of a motion to redeem; (5) determination of whether a proof of

claim had been filed; (6) if an objection to the proposed redemption was filed, discussion of

resolution with the creditor; (7) review of valuation reports; (8) if contested, preparation of an

appraiser and the debtor for hearing; and (9) attendance at valuation hearing if no settlement was

reached. As to the specific dealings with Redemption Funding, Chapter 7 Counsel testified that:

(1) he had no business arrangement with Redemption Funding to send clients to them; (2) he

normally received a vehicle condition report and letter from Redemption Funding showing

conditional approval of a loan and a preliminary comparison of reaffirmation on the vehicle,

versus the redemption, to demonstrate the benefit to the client; (3) the originals (including a copy

of the proposed contract) were sent to the client, and the copies to Chapter 7 Counsel; (4)

Chapter 7 Counsel would typically file that contract with the motion to redeem or at least send a

copy to the U.S. Trustee's office; (5) if Redemption Funding produced all necessary documents,

Chapter 7 Counsel's office could generate a motion for approval in about 15 to 30 minutes and,

36

from there, it went through several stages to get the order for approval; and (6) if the redemption was approved, Chapter 7 Counsel notified Redemption Funding and it, in turn, sent the original contracts to the clients who would then sign and return them and then Redemption Funding would fund the loan. [94]

First, noting that section 329 of the Bankruptcy Code granted a bankruptcy court authority to review the receipt of attorney's fees by Chapter 7 Counsel from Redemption Funding, the *Ray* court analyzed the following two issues related to the fee arrangement: (1) whether the receipt of the attorney's fees through Redemption Funding created a conflict of interest which inappropriately influenced the attorney's advice to redeem vehicles in these cases; and (2) whether the attorney's fee of $300 for vehicle redemptions in each of these cases was excessive.[95] As to the conflict of interest issue, the bankruptcy court first analyzed the ethical issues raised by the Tennessee Rules of Professional Conduct, specifically, Rule 1.7 and Rule 1.8. Rule 1.7, entitled "conflict of interest" provided:

> . . .
> (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client *or to a third person*, *or by the lawyer's own interests*, unless:
> (1) the lawyer reasonably believes the representation will not be adversely affected; and
> (2) the client consents in writing after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.[96]

---

[94] *Ray*, 314 B.R. at 647-48.

[95] *Id.* at 652.

[96] Tenn. Sup. Ct. R. 8, RPC 1.7(b) (2003) (emphasis added).

In the notes to Rule 1.7, the drafters contemplated lawyers being paid by a source other than the client and provided the following:

> A lawyer *may be paid from a source* other than the client *if the client is informed of that fact and consents and if the arrangement does not compromise the lawyer's duty of loyalty to the client*. *See* RPC 1.8(f). . . . [97]

Rule 1.8(f) of the Tennessee Rules of Professional Conduct further provided that:

> (f) A lawyer shall not accept compensation or direction from one other than the client unless:
> (1) the client consents after consultation;
> (2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and
> (3) information relating to representation of a client is protected as required by Rule 1.6.[98]

Harmonizing all of these rules with the evidence presented, the bankruptcy court in *In re Ray* ultimately found that there was not a conflict of interest issue under the Tennessee Rules of Professional Conduct because: (1) the debtors all testified to their awareness of the $300 fee charged by Chapter 7 Counsel; (2) the debtors all expressed their desire to keep their current vehicles; (3) all of the debtors saved on their monthly payments, total costs on the loans, and lessened the amount of their overall secured loans; (4) the debtors were completely satisfied by Chapter 7 Counsel's representation; (5) they understood that they were borrowing additional funds to pay Chapter 7 Counsel's attorney fees; and (6) the debtors all indicated they understood that Redemption Funding was an independent entity not associated with Chapter 7 Counsel.[99]

---

[97] Tenn. Sup. Ct. R. 8, RPC 1.7(b), Comment 14 (2003) (emphasis added).

[98] Tenn. Sup. Ct. R. 8, RPC 1.8(f) (2003).

[99] *Ray*, 314 B.R. at 653-59. *But see In re Miller*, 312 B.R. 626, 629 (Bankr. S.D. Ohio 2004) (without hearing testimony from the debtors, the court held that a conflict of interest issue did indeed exist where Redemption Funding—the same entity involved in *In re Ray*—paid debtors' counsel's fees related to redemption of vehicle).

In addition to the conflicts of interest potentially raised under the Tennessee Rules of Professional Conduct, the bankruptcy court in *In re Ray* also examined whether or not there was a statutory conflict of interest under the Bankruptcy Code, specifically under section 327 of the Bankruptcy Code. As alluded to earlier, section 327(a) of the Bankruptcy Code provides that: "(a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." The bankruptcy court held that section 327(a) of the Bankruptcy Code did not apply to a debtor's counsel in chapter 7 cases and the requirement of "disinterestedness" only applied to professionals engaged by a bankruptcy trustee.[100]

Finally, the bankruptcy court explored whether the attorney's fees charged by Chapter 7 Counsel in connection with the redemption and paid for by Redemption Funding were "reasonable." The bankruptcy court noted that section 329 of the Bankruptcy Code allows a court the authority to examine the reasonableness of fees charged by a debtor's attorney. In determining the reasonableness of Chapter 7 Counsel's fees, the bankruptcy court considered: (1) Chapter 7 Counsel's experience (21 years as an attorney, doing exclusively bankruptcy work since 1986); (2) the hourly rate of attorneys with similar clients and experience; (3) the skill of Chapter 7 Counsel and quality of his legal services (all clients were satisfied with representation and would refer others to him); (4) the difficulty associated with the work performed (Chapter 7 Counsel provided credible testimony about the novelty and uniqueness of each of these debtors' situations); and (5) whether Chapter 7 Counsel distributed the work to minimize costs (Chapter 7

---

[100] *Ray*, 314 B.R. at 659-60.

Counsel's estimates of his time and his staff's time in each redemption was reasonable and not unduly weighted toward attorney time versus staff time). Given all of this proof, the bankruptcy court ultimately held that the $300 fee charged by Chapter 7 Counsel was reasonable under the circumstances and did not require an order of disgorgement.[101]

The court believes that there are some significant principles that can be gleaned from the *In re Ray* case. First, as noted earlier, section 327(a) of the Bankruptcy Code and its "disinterestedness" requirement (and requirement that counsel have no "adverse interests") technically do not apply to chapter 7 debtor's counsel.[102] Nevertheless, state ethical rules do apply. Thus, a court should look to those rules for guidance when confronted with a potential conflict of interest issue in a chapter 7 or 13 case, such as a third party paying debtor's counsel's fees. Additionally, a disclosed fee arrangement under section 329 should always be reviewed by the court for "reasonableness" in order to ensure that a debtor is not overpaying for any services being provided by debtor's counsel.[103] Finally, this court would be remiss if it did not make note

---

[101] *Id.* at 661-63.

[102] Courts have similarly found that section 327(a) of the Bankruptcy Code also does not apply to debtor's counsel in chapter 13. *In re Gutierrez*, 309 B.R. 488, 500 (Bankr. W.D. Tex. 2004).

[103] As this court has already ordered the disgorgement of the entire amount of fees that Prior Bankruptcy Counsel received from New Start Auto, reasonableness is a moot issue. *See, e.g., In re Whaley*, 282 B.R. 38, 42 (Bankr. M.D. Fla. 2002) (upon ordering disgorgement of fee due to debtor's counsel non-disclosure under section 329 of the Bankruptcy Code, bankruptcy court made no specific ruling on reasonableness of the fees charged). However, the court certainly has concerns about whether or not some of the fees received by Prior Bankruptcy Counsel from New Start Auto were, in fact, "reasonable." By way of example, the first case on Exhibit 1, *Felicia Crump* (Case No. 12-33639), indicates that a $400 fee was received by Prior Bankruptcy from New Start Auto. In the "Reason Why Client Went to New Start Auto" box on Exhibit 1, Prior Bankruptcy Counsel has stated the following: "Filed chapter 13 to pay back mtg arrears and vehicle. Filed chapter 13 6/4/2012. Car started to give her problems and in August 2014 filed motion to incur debt to allow debtor to purchase a new vehicle that would not break down on her." When looking at the Docket Sheet in the *Felicia Crump* bankruptcy case, no Motion to Incur Debt was ever filed. Was this a misstatement by counsel? Did Prior Bankruptcy Counsel simply obtain a letter from the Chapter 13 Trustee approving the incurrence of debt and consider this the equivalent of filing a motion? If Prior Bankruptcy Counsel was charging $400 for merely getting an approval letter from the Chapter 13 Trustee, the court would be concerned about the reasonableness of such fee based on the services provided. However, as stated above, reasonableness is really a moot point, in light of the fact that this court has already ordered the disgorgement of the entire amount of fees received by Prior Bankruptcy Counsel from New Start Auto.

of the significant factual differences between the *In re Ray* case and the facts presented by this Show Cause Matter. Among other things, *In re Ray* involved a situation in which the Chapter 7 Counsel **did** disclose the payments of fees it received from Redemption Funding. Thus, there were no secret payments—the United States Trustee simply moved for disgorgement upon seeing the Chapter 7 Counsel's disclosure. Moreover, there was fulsome and candid evidence presented to the court. The *In re Ray* opinion makes clear that the court heard a full day of testimony and evidence, including expert witnesses from various members of the consumer bankruptcy world opining about the ethics of what had happened. Perhaps most importantly, the *In re Ray* case involved redemption of vehicles (which had happened only a handful of times— versus the 106 or 108 times that H&W Law Firm clients purchased vehicles from New Start Auto). Not only was there no appearance of Chapter 7 Counsel frequently steering clients to Redemption Funding (to the point of creating an appearance that Chapter 7 Counsel might be motivated by an incentive to get fees paid from them) but, in general, *redemption is an extremely advantageous remedy for chapter 7 debtors*, because it effectively enables chapter 7 debtors to cram down secured claims of car lenders to the value of their collateral/vehicles, saving significant funds for chapter 7 debtors. In the *In re Ray* case, there was extensive evidence about the favorability of the redemption deals that Chapter 7 Counsel had presented to the court. In the New Start Auto/H&W Law Firm situation before the court, we are not addressing situations where debtors were redeeming vehicles. Rather the debtors who were doing business with New Start Auto were taking on entirely new debt for a new vehicle and the court thinks this is an important distinction. H&W Law Firm stated that it thought New Start Auto offered good deals, but H&W Law Firm did no investigation of the reasonableness of their interest rates charged to clients or the values of the cars (versus prices charged). Moreover, the

41

sequence of timing in the chapter 7 scenarios involving New Start Auto is oh-so-troubling: debtors would visit with New Start Auto; decide to acquire a car from them; file or convert to Chapter 7; New Start Auto would pay some of the debtors' attorney's fees associated with the Chapter 7 case to H&W Law Firm; then after the filing, the debtors would obtain their new postpetition car (and would get a discharge of their other debt in Chapter 7, with New Start Auto not being affected by the discharge). None of this was disclosed. Despite these differences, the *In re Ray* case does provide this court with some useful guidelines in evaluating whether or not the payment of attorney's fees by a third party to debtor's counsel potentially raises a conflict of interest issue, including the violation of state ethical rules.

### b) Texas Disciplinary Rules Applied to these Issues.

Using *In re Ray* as guidance, the court will explore some of the potential conflicts of interest issues that may arise under the Texas Disciplinary Rules of Professional Conduct in the context of New Start Auto paying a portion of Prior Bankruptcy Counsel's attorney's fees. The court believes that the following rules are germane to this court's conflict of interest analysis. First, Rule 1.06 entitled "Conflict of Interest" provides that:

> . . .
> (b) In other situations and except to the extent permitted by paragraph (c), ***a lawyer shall not represent a person if the representation of that person***:
> (1) involves a substantially related matter in which that person's interests are materially and directly adverse to the interests of another client of the lawyer or the lawyer's firm; or
> (2) ***reasonably appears to be or become adversely limited*** by the lawyer's or law firm's responsibilities to another client or to a third person or ***by the lawyer's or law firm's own interests***. . . .[104]

Comment 12 to Rule 1.06 further provides that:

> Interest of Person Paying for a Lawyer's Service

---

[104] Tex. Disciplinary Rules Prof'l Conduct R. 1.06 (emphasis added).

>    12. ***A lawyer may be paid from a source other than the client, if the client is informed of that fact and consents and the arrangement does not compromise the lawyer's duty of loyalty to the client***. See Rule 1.08(e). For example, when an insurer and its insured have conflicting interests in a matter arising from a liability insurance agreement, and the insurer is required to provide special counsel for the insured, the arrangement should assure the special counsel's professional independence. So also, when a corporation and its directors or employees are involved in a controversy in which they have conflicting interests, the corporation may provide funds for separate legal representation of the directors or employees, if the clients consent after consultation and the arrangement ensures the lawyer's professional independence.[105]

Next, Rule 1.08(e) provides that:

>    (e) A lawyer shall not accept compensation for representing a client from one other than the client unless:
>    (1) ***the client consents***;
>    (2) ***there is no interference with the lawyer's independence of professional judgment*** or with the client-lawyer relationship; and
>    (3) ***information relating to representation of a client is protected as required by Rule 1.05***.[106]

Comment 5 to Rule 1.08 provides:

>    Person Paying for Lawyer's Services

>    5. ***Paragraph (e) requires disclosure to the client of the fact that the lawyer's services are being paid for by a third party. Such an arrangement must also conform to the requirements of Rule 1.05 concerning confidentiality and Rule 1.06 concerning conflict of interest.*** Where the client is a class, consent may be obtained on behalf of the class by court-supervised procedure. Where an insurance company pays the lawyer's fee for representing an insured, normally the insured has consented to the arrangement by the terms of the insurance contract.[107]

Finally, Rule 5.04 entitled "Professional Independence of a Lawyer" provides that:

---

[105] Tex. Disciplinary Rules Prof'l Conduct R. 1.06, comment 12 (emphasis added).

[106] Tex. Disciplinary Rules Prof'l Conduct R. 1.08(e) (emphasis added). Moreover, Rule 1.05(b) provides: "(b) Except as permitted by paragraphs (c) and (d), or as required by paragraphs (e) and (f), a lawyer shall not knowingly: (1) Reveal confidential information of a client or a former client to: (i) a person that the client has instructed is not to receive the information; or (ii) anyone else, other than the client, the client's representatives, or the members, associates, or employees of the lawyer's law firm." Tex. Disciplinary Rules Prof'l Conduct R. 1.05(b).

[107] Tex. Disciplinary Rules Prof'l Conduct R. 1.08, comment 5 (emphasis added).

. . .

(c) A lawyer shall not permit a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services. . . . [108]

Comments 4 and 5 to Rule 5.04 provide that:

4. Because the lawyer-client relationship is a personal relationship in which the client generally must trust the lawyer to exercise appropriate professional judgment on the client's behalf, Rule 5.04(c) provides that a lawyer shall not permit improper interference with the exercise of the lawyer's professional judgment solely on behalf of the client. ***The lawyer's professional judgment should be exercised only for the benefit of the client, free of compromising influences and loyalties.*** Therefore, under Rule 5.04(c) a person who recommends, employs, or pays the lawyer to render legal services for another ***cannot be permitted to interfere with the lawyer's professional relationship with that client. Similarly, neither the lawyer's personal interests, the interests of other clients, nor the desires of third persons should be permitted to dilute the lawyer's loyalty to the client.***

5. Because a lawyer must always be free to exercise professional judgment without regard to the interests or motives of a third person, the lawyer who is employed or paid by one to represent another should guard constantly against erosion of the lawyer's professional judgment. The lawyer should recognize that a ***person or organization that pays or furnishes lawyers to represent others possesses a potential power to exert strong pressures against the independent judgment of the lawyer.*** The lawyer should be watchful that such persons or organizations are not seeking to further their own economic, political, or social goals without regard to the lawyer's responsibility to the client. Moreover, a lawyer employed by an organization is required by Rule 5.04(c) to decline to accept direction of the lawyer's professional judgment from any nonlawyer in the organization.[109]

Synthesizing these rules and comments together, this court can deduce the following standard: a lawyer is permitted to represent a client, but accept payment from a third party, provided certain conditions are satisfied: (1) the client must be informed of the fact that a third party will be paying the client's attorney's fees and consent to such arrangement; (2) the arrangement ***cannot compromise the lawyer's duty of loyalty to the client***; (3) the third party payer is prohibited from

---

[108] Tex. Disciplinary Rules Prof'l Conduct R. 5.04.

[109] Tex. Disciplinary Rules Prof'l Conduct R. 5.04., comments 4 & 5 (emphasis added).

directing, regulating, or *interfering with the lawyer's professional judgment in representing the client*; and (4) the lawyer is prohibited from communicating with the third-party payer concerning the substance of the representation of the client. *Herein lies the rub: making a determination about whether these conditions were satisfied by the H&W Law Firm in 106 different situations would be extremely fact intensive and would require this court to delve into not only the attorney-client relationship between all of the debtors in the 106 cases and Prior Bankruptcy Counsel, but also the relationship between Prior Bankruptcy Counsel and New Start Auto*. The court is not in a position to do this, based on the evidence presented. However, if nothing else, these rules demonstrate the importance of full disclosure pursuant to Bankruptcy Code section 329 and Bankruptcy Rule 2016. If Prior Bankruptcy Counsel had complied with section 329 and Rule 2016, parties-in-interest and the court would have been in a position in each and every one of the 106 cases in which New Start Auto paid part of H&W Law Firm's fees to evaluate on a timely basis the facts—to determine if H&W Law Firm was acting in its own self-interests or in the clients' interests; to determine if H&W Law Firm was compromised in its duty of loyalty to its client or not; to determine if New Start Auto was interfering with H&W Law Firm's independent professional judgment or not. By not having disclosed the fee arrangement, it may be impossible to evaluate the merits of all 106 situations after the fact. This is why the court has found the disgorgement ordered herein for *nondisclosure* to be appropriate and the most palatable remedy. Because, while the court is in no position at this juncture to evaluate conflicts of interest (and duties of loyalty and professional judgment) after the fact in 106 cases with a sparse record, the court is in the position to order the sanction of disgorgement where it is clear that H&W Law Firm was not candid with the court[110] and violated basic duties

---

[110] *See* Tex. Disciplinary Rules Prof'l Conduct R. 3.03.

of disclosure under section 329 of the Bankruptcy Code and Bankruptcy Rule 2016. This Ruling

is without prejudice to the United States Trustee or the State Bar of Texas exploring these issues

in subsequent proceedings further, with regard to New Start Auto's overall activity in this

District.[111]

### 3.    Section 526(a) of the Bankruptcy Code: Violations?

Finally, the court will address its concerns about whether section 526(a) of the

Bankruptcy Code has been violated in this case. The court raised concerns with the parties

regarding section 526(a)(4) of the Bankruptcy Code, and asked for and received post-hearing

briefing on it and other issues. However, as explained further below, this court, after receiving

the post-briefing, has developed some additional concerns about section 526(a)(2) of the

Bankruptcy Code.

Section 526(a)(4) of the Bankruptcy Code was added to the Bankruptcy Code in the year

2005, as part of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA").

It provides that:

> (a) A debt relief agency shall not— . . .
> (4) advise an assisted person or prospective assisted person to incur more debt in
> contemplation of such person filing a case under this title or to pay an attorney or
> bankruptcy petition preparer fee or charge for services performed as part of
> preparing for or representing a debtor in a case under this title.[112]

The Supreme Court held in *Milavetz, Gallop & Milavetz, P.A. v. United States.*, 559 U.S. 229,

239 (2010), that attorneys who provide bankruptcy assistance to assisted persons in return for

consideration are "debt relief agencies" within the meaning of the BAPCPA and, thus, Prior

---

[111] A federal court may hold attorneys accountable for violations of the Disciplinary Rules of Professional Conduct. *Resolution Trust Corp. v. Bright*, 6 F.3d 336, 341 (5th Cir. 1993); *see also* footnote 55 *supra*.

[112] 11 U.S.C. § 526(a)(4).

Bankruptcy Counsel would be subject to section 526. Moreover, the Supreme Court stated in *Milavetz*, that advice to incur more debt because of bankruptcy, as prohibited by section 526(a)(4) of the Bankruptcy Code, will generally consist of advice to "load up" on debt with the expectation of obtaining its discharge.[113] Thus, the Supreme Court held that an attorney violates section 526(a)(4) "only when the impetus of the advice to incur more debt is the expectation of filing for bankruptcy and obtaining the attendant relief."[114] Here, the facts indicate that when Prior Bankruptcy Counsel was advising a debtor on the purchase of a car from New Start Auto prior to the filing of a new chapter 7 bankruptcy case (and was receiving attorney's fees from New Start Auto to file that chapter 7 case), the car would not technically be acquired (and the debt thereon incurred) until ***after*** the bankruptcy filing. This would prevent it from being discharged.[115] Thus, the court does not believe that section 526(a)(4) of the Bankruptcy Code would ***technically*** apply to these facts, as the expectation was that the debt would not be discharged, which is the opposite of what the Supreme Court held in *Milavetz*. Despite what appears to be a straightforward application of *Milavetz*, the court still has some concerns about the applicability of section 526 of the Bankruptcy Code to the facts here—specifically section 526(a)(2).

Section 526(a)(2) of the Bankruptcy Code provides that "A debt relief agency shall not ... make any statement, or counsel or advise any assisted person or prospective assisted person ***to make a statement in a document filed in a case or proceeding under this title, that is untrue or misleading, or that upon the exercise of reasonable care, should have been known by such***

---

[113] *Milavetz, Gallop & Milavetz, P.A. v. U.S.*, 559 U.S. 229, 244 (2010).

[114] *Id.* at 248.

[115] This was also the case where a debtor was in a chapter 13 case and converting to chapter 7.

*agency to be untrue or misleading*."  With regard to section 526(a)(2) of the Bankruptcy Code,

the court is concerned that statements made by debtors represented by H&W Law Firm in their

schedules (the "Schedules") and statement of financial affairs (the "SOFAs") may have been

untrue or misleading, in light of the transactions with New Start Auto of which Prior Bankruptcy

Counsel would have been aware, since it was being paid attorney's fees by New Start Auto.

Specifically, the court notes the following items that appear in the Schedules and SOFAs that

every debtor must sign under penalty of perjury and file with the bankruptcy court: (1) Question

24 on Bankruptcy Schedule J requires a debtor to state "yes" or "no" to the question "do you

expect an increase or decrease in your expenses within the year after you file this form?" (in the

scenario where a debtor was planning on purchasing a car from New Start Auto after the filing of

a chapter 7 case, the debtor should have reported "yes" and possibly listed the new car payment

in response to this question);[116] and (2) Question 16 on the SOFAs, which requires a debtor to

state "yes" or "no" to the question "within 1 year before you filed for bankruptcy, did you or

anyone else acting on your behalf pay or transfer any property to anyone you consulted about

seeking bankruptcy or preparing a bankruptcy petition?" (in the scenario where New Start Auto

was paying a portion of Prior Bankruptcy Counsel's attorney's fees to file a new chapter 7 case,

a debtor would have needed to report that New Start Auto was paying that fee).[117]

　　　　Regrettably, the court is unable to make any real determinations as to whether section

526(a)(2) of the Bankruptcy Code was implicated in various of H&W Law Firm's cases, based

upon the evidentiary record currently before it and does not feel any further analysis on this issue

---

[116] *See* Bankruptcy Form B 106J (effective December 1, 2015).  This question also appears on the previous form of Schedule J as Question 24.  *See* Bankruptcy Form B 6J (effective December 1, 2013 to December 1, 2015).

[117] *See* Bankruptcy Form B 107 (effective April 1, 2016).  This question also appears on the previous form of the SOFAs as Question 9.  *See* Bankruptcy Form B 7 (effective April 1, 2013 to December 1, 2015).

would be appropriate at this time. As noted early in this Memorandum Opinion, New Start Auto's payment of attorney's fees to Prior Bankruptcy Counsel appeared to occur most often within the context of the filing of a new chapter 7 case. The testimony indicated that the actual vehicle transaction would always close *post*-chapter 7 bankruptcy filing, even though the transaction was clearly agreed upon well *before* the debtor ever filed. Was this all very clever timing? Were the Schedules and SOFAs deficient for not disclosing what was negotiated but not finalized? The court believes that this may be the case, and if so, maybe section 526 of the Bankruptcy Code would come into play. But again, this court does not have enough in the record to fully explore such a possibility. The court would need to hear further evidence from New Start Auto as to how these transactions were structured and the purpose behind such transactions. This is all without prejudice to the United States Trustee's discretion and ability to further explore these issues in any separate proceedings it may decide to commence.

## III.    CONCLUSION

This court has expressed in another case in another context recently[118] that there seems to be a significant number of consumer debtors acquiring vehicles during the pendency of their cases. The court is concerned that debtors are being preyed upon by used car dealers who get debtors' names from public data bases or even debtors' counsel, and sometimes debtors' counsel may not be giving their clients sensible, uncompromised advice. Moreover, getting a "new" car (even if it is used) during or in connection with a bankruptcy case should be the exception and not the rule. The court recognizes that bad things sometimes happen: car wrecks and costly car repairs. This court fears, however, that debtors are frequently simply "upgrading" their vehicles in connection with a bankruptcy filing—especially if they are being inundated with mailed

---

[118] *In re Ward*, 546 B.R. 667 (Bankr. N.D. Tex. 2016).

advertisements enticing them by stating that it is easy and acceptable to do. And especially if their counsel has a financial incentive to steer the debtor in that direction (because the used car dealership is paying his attorney's fees).

This court is extremely troubled by what it has heard and knows that this Show Cause Matter has likely only scratched the surface of undisclosed transactions in this District involving New Start Auto. There seem to be far more questions than satisfying answers at this juncture, but for now, all this court can do is try to address the problems that the court has identified in Ms. Fair's bankruptcy case and—to some extent—the 106 others involving Prior Bankruptcy Counsel. Based upon what was discovered in this case, the United States Trustee or State Bar of Texas may be inclined to journey further.

Based upon the reasons articulated above, it is

**ORDERED** that Prior Bankruptcy Counsel shall file amended Rule 2016(b) disclosures in all cases where New Start Auto has provided Prior Bankruptcy Counsel attorney's fees, and any Clerk fees associated with such filings (*i.e.*, fees for a motion to reopen) shall be the joint and several liability of Mr. W and Mr. H;[119] and it is further

**ORDERED** that Prior Bankruptcy Counsel shall be required to disgorge the entire amount of attorney's fees received from New Start Auto in the amount of *$77,175* and that Mr. W and Mr. H shall jointly and severally be obligated to pay over the funds to the registry of the United States Bankruptcy Court of the Northern District of Texas within fifteen (15) business days of the entry of this order; and it is further

---

[119] As noted earlier, the court has been advised that the H&W Law Firm dissolved shortly after the Show Cause Order was entered. Therefore, all responsibilities and payments ordered herein apply to Mr. H and Mr. W, jointly and severally.

**ORDERED** that the Chapter 13 Trustee and United States Trustee may file fee applications requesting reimbursement of reasonable and necessary attorney's fees and expenses that they have incurred in this Show Cause Matter from the disgorged funds (such fee applications shall be filed within sixty (60) days after entry of this Memorandum Opinion and Order); and it is further

**ORDERED** that any disgorged fees remaining after fee applications are filed and potentially allowed pursuant to the preceding paragraph shall be paid over by the Clerk as an unrestricted donation to the Texas Access to Justice Foundation; and it is further

**ORDERED** that the Show Cause Order entered by this court on September 25, 2015 [DE # 26] is hereby **DISCHARGED**.

### ### END OF ORDER ###